UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

---

SUZANNE HESS, *on behalf of herself
and all others similarly situated,*

                        Plaintiff,

v.

I3 VERTICALS, LLC; CP-DBS, LLC, d/b/a
PAYSCHOOLS, and other related entities;

                        Defendants.

Case No.2:25-cv-3469-ST

**AMENDED CLASS ACTION
COMPLAINT**

**JURY TRIAL DEMANDED**

---

       Plaintiff Suzanne Hess ("Plaintiff"), by and through her undersigned counsel, brings this Class Action Complaint against Defendants I3 VERTICALS, LLC; CP-DBS, LLC d/b/a PaySchools; and other related entities ("PaySchools" or "Defendants"), and alleges as follows based upon information and belief, except as to the allegations specifically pertaining to her, which are based on personal knowledge.

## <u>NATURE OF THE ACTION</u>

       1.    School meal programs are an integral component of primary and secondary educational systems in the United States and in the state of New York.

       2.    Each morning thousands if not millions of parents and guardians send their kids to school, and make sure they have money to buy lunch.

       3.    For decades, schools have given their students cost-effective lunch, breakfast, and milk to ensure that kids are fed nutritious meals so they can focus on learning.

       4.    Before companies like Defendants were involved, the transactions were straightforward– with the only goal being to make sure students were fed healthy food and beverages to make it through the school day until they returned home.

5.    Defendants have corrupted that transaction and injected themselves as middlemen, profiting both from the parents (i.e., junk fees on transactions), and the school districts (i.e., contracting for guaranteed annual payments), thereby diverting money away from the central exchange of food for students to themselves, while delivering only ancillary services.

6.    Defendants' actions are illegal under federal law, violate state law, violate the terms between credit card companies and merchants, and upon information and belief violate the contract between the school, the school district, and the terms Defendants are required to comply with.

7.    A pre-pandemic survey of teachers across the United States found that when students are hungry at school, it affects their ability to concentrate, leads to poor academic performance, and causes increased behavioral and discipline problems.[1]

8.    These problems are particularly acute for students from low-income communities, 60 percent of whom report having come to school hungry.[2]

9.    School meal programs help close the academic gap between children living with food insecurity and their peers. For example, research shows that availability of school breakfasts increases educational attainment scores,[3] and that availability of school lunches has "sizable" lifetime effects on educational attainment.[4]

10.    But the benefits of school meal programs are not enjoyed only by low-income students. Tens of millions of children, whose families do not meet income thresholds for free or

---

[1] *Teachers: Hungry Kids Can't Learn*, No Kid Hungry 2017), https://www.nokidhungry.org/sites/default/files/pdfs/hungry_kids_cant_learn_-_hunger_in_our_schools_micro_report.pdf (last accessed April 29, 2025).
[2] No Kid Hungry, *How Does Hunger Affect Learning?*, https://www.nokidhungry.org/blog/how-does-hunger-affect-learning (April 24, 2023).
[3] David E. Frisvold, *Nutrition and Cognitive Achievement: An Evaluation of the School Breakfast Program*, 124 J. Pub. Econ. 91 (2015), https://doi.org/10.1016/j.jpubeco.2014.12.003.
[4] Peter Hinrichs, *The Effects of the National School Lunch Program on Education and Health*, 29 J. Policy Analysis and Management 479 (2010), https://doi.org/10.1002/pam.20506.

2

reduced-price meals, rely on the availability of reasonably priced, nutritionally balanced meals available every day in the convenience of the school cafeteria.

11.     In fact, according to a recent study authored by the dean of the School of Nutrition Science at Tufts University, "Schools are now the single healthiest place Americans are eating."[5]

12.     Unfortunately, a new generation of school bullies is hard at work making school meals less affordable for working families in the United States and in New York. These bullies are highly sophisticated payment processing companies like PaySchools.

13.     PaySchools' business model is to take advantage of its captive audience, children and families, by charging unjustifiable "convenience" and "service" fees at the school lunch counter (hereafter, "Junk Fees").

14.     These Junk Fees plague normal and ordinary transactions whereby parents or family members provide money so that students can eat school lunches.

15.     Though PaySchools describes Junk Fees as related to the cost of offering payment services to working families, the Junk Fees bear little or no relationship to PaySchools' costs of doing business.

16.     Nor does the nature of PaySchools' payment structure, through which they charge a significant fee on every single minimum transaction, without allowing any alternatives that may save families money – like permitting larger deposits, permitting fee-free transaction options, promoting those fee-free transaction options, tethering the transaction fee to the actual cost of

---

[5] Audrey Laganas Jenkins, *Study Finds Americans Eat Food of Mostly Poor Nutritional Quality – Except at School*, TuftsNow (Apr. 12, 2021), https://now.tufts.edu/2021/04/12/study-finds-americans-eat-food-mostly-poor-nutritional-quality-except-school (last accessed April 29, 2025).

conducting the transaction, or permitting other entities to compete within the school for the same services.

17.    PaySchools does not disclose the existence of fee-free options, does not disclose that the school (and or school district) is paying a significant price to cover the cost of services, does not disclose that charging fees for access to school lunch, breakfast, and milk programs is illegal, and does not disclose that the fees reduce the amount of food and beverages available to students.

18.    PaySchools does not disclose that its charging of Junk Fees violates the terms it's required to follow as a merchant under the credit card networks' governing agreements, including Visa Core Rules and Visa Product and Service Rules.

19.    Upon information and belief, compliance with these credit card system rules are incorporated into its agreement with the school (or school district).

20.    PaySchools' Junk Fees, as assessed to Plaintiff Hess here, violate both Visa's Rules regarding convenience and surcharge fees.

21.    Upon information and belief, PaySchools does not disclose that it has agreed via contract to comply with all state and federal laws, and does not disclose that it requires the school districts to engage in exclusivity agreements for its services.

22.    PaySchools failed to comply with the rules of the credit card companies[6] as part of their agreement as a merchant, including to properly disclose a debit or credit card surcharge and

---

[6] To carry out the PaySchools' program, Defendants entered into an agreement with the school or school district. By using payment cards to process payments, either PaySchools, the school district, or both must be bound by all the rules imposed on merchants by the credit card companies such as Visa, Mastercard, American Express, and Discover. *See e.g.*, https://usa.visa.com/dam/VCOM/download/about-visa/visa-rules-public.pdf; id. at 5.5 (describing disclosure rules for "Surcharges, Convenience Fees, and Service Charges").

to refrain from assessing convenience, surcharge, and other fees that do not comply with the rules of the Credit Card companies.

23.     Defendants' agreements, including the material terms, with the school, the school district, the credit card companies, financial institutions, and/or other entities were not disclosed to parents or students.

24.     Plaintiff Hess and similarly situated parents, guardians, and/or students were intended beneficiaries of the contracts that PaySchools, the school, and the school district entered into.

25.     The Junk Fees simply pad PaySchools' bottom line, at the expense of families because, in most circumstances, the school districts already pay these companies for their services.

26.     The Junk Fees allow PaySchools and other payment processors to "double dip" by charging both the school district and families, and prevent many children who are entitled to free and reduced lunches from being able to receive the full benefit of these programs.

27.     Defendants limit access to school lunch, breakfast, and milk programs by assessing these Junk Fees – forcing parents to pay these fees, limiting their child's access to food and beverages, and limiting the school's ability to spend more money on healthy food and beverages for its students.

28.     As detailed in a July 2024 study by the Consumer Financial Protection Bureau ("CFPB"), the transaction fees that PaySchools and others charge "may send $0.60 to payment processors for each $1 [that low-income families] spend on school lunch." Attached as **Exhibit A** at p. 4.[7]

---

[7] Exhibit A is a copy of the CFPB's July 2024 Study *Costs of Electronic Payments in K-12 Schools* (the "CFPB Study").

29.     Not only do the Junk Fees disproportionately harm the working poor, but the aggregate cost of Junk Fees are also staggering. The CFPB estimates that school lunch Junk Fees cost children and their families around $100 million each year.[8] This is $100 million that could, and should, have gone to buying students food or covering other household expenses.

30.     As former President Biden explained in the 2023 State of the Union address, "Junk fees may not matter to the very wealthy, but they matter to most folks in homes like the one I grew up in. They add up to hundreds of dollars a month. They make it harder for you to pay the bills[.]"[9]

31.     PaySchools' Junk Fee practices ensnare parents and students. Parents and caregivers cannot choose their payment platform.

32.     Fee-free options may not be meaningfully available to all families. The Junk Fees add up for families, particularly those with lower incomes, and PaySchools faces little competition.[10]

33.     In fact, fee-free payment options are not disclosed at all, either on the website of the school, on PaySchools' website, or during the transactions themselves.

34.     Further, PaySchools' fees increase based on the timing of the transaction. For example, if a parent or family member attempts to fund a single lunch, the Junk Fees increase beyond even the excessive typical levels for such Junk Fees.

35.     PaySchools' Junk Fee practices are not only wrong. They are also illegal.

---

[8] *Id.*
[9] Biden White House Archives, *Remarks of President Joe Biden – State of the Union Address as Prepared for Delivery* (Feb. 7, 2023), https://bidenwhitehouse.archives.gov/briefing-room/speeches-remarks/2023/02/07/remarks-of-president-joe-biden-state-of-the-union-address-as-prepared-for-delivery/
[10] Ex. A at 10.

6

36.     Plaintiff paid PaySchools' Junk Fees, and now bring this Class Action Complaint on behalf of herself and all others similarly situated—parents, guardians, and caregivers of students in New York schools—to obtain redress and prevent future harm.

## PARTIES

37.     Plaintiff, Suzanne Hess, is an adult, who at all relevant times, is a resident and citizen of the state of New York.

38.     Plaintiff Suzanne Hess was required to pay PaySchools' junk fee from September 2023 till present as part of providing a meal for her child that attended Garden City Public Schools.

39.     Upon information and belief, I3 Verticals LLC, other unknown entities, and CP-DBS, LLC jointly operate under the brand of PaySchools.

40.     Defendant CP-DBS, LLC is a limited liability company organized under the laws of Delaware and with its primary place of business at 40 Burton Hills Blvd., Nashville, Tennessee. Defendant is a citizen of Delaware and Tennessee.

41.     CP-DBS, LLC transacts business in New York but has failed to register with the New York State Department of State as a business entity.

42.     I3 Verticals, LLC, is the parent company of CP-DBS, LLC that controls, manages, and dictates the policies of PaySchools.

43.     I3 Verticals, LLC, is a foreign limited liability company organized under the laws of Delaware, but registered as active within New York under DOS ID 4462350 within the county of Westchester with a registered agent at National Registered Agents, Inc., at 28 Liberty St., New York, NY 10005.

44.     Defendants operating as PaySchools charge Junk Fees to parents like Plaintiff and students through its school lunch programs in school districts throughout New York, including within Nassau County.

45.     Upon information and belief, hundreds if not thousands of transactions took place in Nassau County during the relevant period in which Defendants deceptively and illegal took Junk Fees from parents like Plaintiff.

## JURISDICTION AND VENUE

46.     This Court has personal jurisdiction over Defendants because it operates a business in New York.

47.     Venue is proper in this District because Plaintiff and Class members reside in the Eastern District and throughout the state of New York. Defendants elected to transact business in this District and many of the acts and transactions giving rise to this action occurred in this District.

## FACTUAL ALLEGATIONS

**A.  America's School Lunch Programs Allow Children to Focus on Education, Not Hunger**

48.     Congress passed the National School Lunch Act in 1946 as a "a measure of national security, to safeguard the health and well-being of the Nation's children and to encourage the domestic consumption of nutritious agricultural commodities and other food[.]" 42 U.S.C. § 1751.

49.     The National School Lunch Program ("NSLP") is run by the United States Department of Agriculture ("USDA") and has been repeatedly renewed and updated for nearly 80 years.

50.     Each day, almost 30 million children eat school lunches provided through the NSLP, with more than 21 million of those served free or reduced-price lunches.[11]

---

[11] School Nutrition Association, School Meal Statistics, https://schoolnutrition.org/about-school-meals/school-meal-statistics/ (last visited May 1, 2025).

51.     In 1966, Congress authorized a School Breakfast Program ("SBP") as a further recognition of "the demonstrated relationship between food and good nutrition and the capacity of children to develop and learn." 42 U.S.C. § 1771.

52.     Each day, more than 15 million children eat school breakfasts through the SBP, with more than 12 million of those served free or reduced-price lunches. [12]

53.     Recognizing the importance of nutrition in early childhood development, as Congress indicated when establishing the NSLP and SBP, the USDA has imposed a requirement that children are not charged additional fees for services provided in conjunction with the delivery of school meals.[13]

54.     According to the USDA, "by charging fees in addition to the regular reduced price or paid meal charge, a school is limiting access to the program and imposing an additional criterion on participants."[14]

55.     Within New York State, the New York State Department of Education administers the school lunch programs and the local schools operate the programs.[15]

**B. The CFPB Blows the Whistle on Payment Processors' Exploitation of American Families**

56.     Payment processors like PaySchools sign contracts with schools and school districts to offer payment services for school meal programs.

---

[12] *Id.*
[13] U.S. Department of Agriculture, Food and Nutrition Services, Fees for Lunchroom Services (June 14, 2021), https://www.fns.usda.gov/cn/fees-lunchroom-services (last accessed April 25, 2025).
[14] *Id.*
[15] https://otda.ny.gov/workingfamilies/schoollunch.asp

57.     Payment processors offer schools and districts, which are often under tight budget constraints and mandates to cut costs, the enticing possibility of reducing their operating expenses by outsourcing payment services.

58.     Payment processors then provide the school or district's families an online payment platform where they can electronically load funds into an account that children can draw from to pay for their meals at school.

59.     The hidden costs of these transactions, however, are borne by children and their families.

60.     The Consumer Financial Protection Bureau ("CFPB") released a report in 2024, titled *Costs of Electronic Payments in K-12 Schools*, exposing the hundreds of millions of dollars in Junk Fees that payment processors like PaySchools have charged parents and caregivers so that their children can eat at school. Ex. A.

61.     The CFPB found that payment processors like PaySchools increase costs to families by charging far more than their processing cost—up to nine times more—to inflate their profits.[16]

62.     According to the CFPB report, payment processors like PaySchools charge American families over $100 million each year in Junk Fees.[17]

63.     On average, at least 8% of the money families pay for school meals goes directly to payment processors like PaySchools.

64.     The burden of these Junk Fees is not born equally: families eligible for free and reduced-price lunch spend as much as ***sixty cents of every dollar*** on Junk Fees.[18]

---

[16] *Id.* at 15.
[17] Ex. A at 4.
[18] *Id.* at 25-26.

65.     Payment processors like PaySchools unilaterally control fee levels and retain the ability to change them at any time. Since families within a school or district can only use the payment platform their district has chosen, they are a captive audience that has no ability to shop around for lower fees.

66.     While some schools also offer other options, they often require, for example, that parents bring a check or cash to the cafeteria during working hours—without an option for families for whom visiting school during the workday is not an option. Other districts limit the use of cash, personal checks, or both, effectively forcing parents to rely on the electronic option or risk their kids going hungry during the school day.

67.     Low-income families are disproportionately impacted by Junk Fees charged in connection with school meal accounts.

68.     Payment processors, like Defendants, often charge Junk fees as flat fees which in particular have a regressive impact on lower-income users—particularly where the same fees are charged regardless of whether a student receives a free or reduced-price lunch. Flat transaction fees are also much more expensive for families who make deposits more frequently, compared to those who can afford to make higher deposits less often.[19]

69.     Following the CFPB Report, on September 18, 2024, eight United States Senators wrote to the Secretary of the Department of Agriculture demanding that the department "act quickly to address exorbitant school lunch fees charged by payment processors."[20]

---

[19] *Id.* at 24.
[20] *See* https://www.warren.senate.gov/imo/media/doc/warren_fetterman_etc_letter_to_usda_on_school_lunch_payment_processing_fees_091824.pdf

11

70.     The Senators called for an end to the practice because, through these Junk Fees, payment processors "snatch[] dollars meant to pay for kids' school lunches in order to pad their profits," calling it "unacceptable that parents face exorbitant fees just so their children can eat school lunch."[21]

## C. PaySchools Exploits American Families at the School Lunch Counter

71.     PaySchools is one of the largest school payment processors in the country, covering over 8,000 schools with more than six million students.

72.     PaySchools engages in each of the problematic industry-wide practices described above.

### a.     PaySchools Sets the Fee Amounts and Decides How to Describe Those Fees

73.     PaySchools enters into Service Agreements with school districts to provide an electronic payment portal ("Pay Schools Central") where parents or caregivers can prepay for their children's school meals. Often this is for breakfast or lunch, but other times—including for children on otherwise free and reduced lunch programs—it is so that kids can buy items that are in addition to a meal, such as snacks or a drink.

74.     Upon information and belief in the Service Agreements, school districts agree to pay PaySchools set amounts for its services. For example, PaySchools charged Academy District 20, in El Paso County, Colorado, $30,000 per year for payment processing services in the 2016-17 school year, according to the CFPB.

75.     Upon information and belief, the contracts offered to schools by PaySchools are adhesion contracts that do not allow schools or school districts to negotiate in a meaningful way

---

[21] *Id.* at 1.

the pricing mandates that PaySchools dictates – nor does it allow schools to contract with other vendors or providers at cheaper rates.

76.     Additionally, the Service Agreements also authorize PaySchools to charge parents fees on a per-transaction basis. However, PaySchools maintains unilateral control over the parent-facing fee structure and disclosures, and in practice, this discretion is abused to inflate prices.

77.     The CFPB found that the actual cost to payment processors for a credit, debit, or prepaid card transaction is around 1.53% of the transaction amount, while the cost of an ACH (electronic bank transfer) transaction is between $0.26 and $0.50 per transaction.[22]

78.     Despite these modest processing costs, PaySchools charges at least $1.75 per transaction made in the Garden City Union Free School District ("GCUFSD"), where Plaintiff's child attends school.

79.     In concrete terms, this means that if a low-income single parent wanted to add $25 to her child's lunch account at a $1.75-per-transaction-school, that the transaction would cost PaySchools about $0.38 cents but would net PaySchools about $1.37 on top of its costs on the transaction—a profit rate more than four times the cost of the transfer.

80.     The profits are not limited to fees. PaySchools can also earn interest accumulated on funds that parents pay to PaySchools while those funds remain in the child's PaySchools account, including after the child is no longer enrolled in the school district.

81.     Despite the CFPB's and the Senate's calls to eliminate these Junk Fees, PaySchools continues to exploit parents and children to this day.

   **b. The PaySchools User Interface Falsely Describes the Junk Fees as "Costs"**

---

[22] Ex. A at 15.

82.     On its website, PaySchools states that "[a]n internet convenience fee and/or transaction fee may be assessed by each district for each transaction made. These fees are charged to cover the credit card processing fee and the cost of using the site."[23]

83.     As described above, however, PaySchools' Junk Fees far exceed the actual costs PaySchools incurs to process payments.

84.     Nor are PaySchools' Junk Fees related to the costs of the PaySchools website, because these costs are already paid for by the school or school district pursuant to its agreement with PaySchools.

85.     In fact, PaySchools goes to great lengths to conceal from consumers that school districts have already paid for the cost of setting up the district-specific implementation of the PaySchools site.

86.     The standard-form Service Agreement that PaySchools enters with a school district states that, if the school district faces an information request under the Freedom of Information Act, 5 U.S.C. § 552 ("FOIA") or an analogous state statute such as New York's Freedom of Information Law ("FOIL"), the school district must invoke statutory exemptions for trade secrets and confidential commercial or financial information and deny the request.

87.     The standard-form Service Agreement also states that PaySchools may seek an injunction to prevent the district from disclosing information responsive to FOIA or FOIL requests.

88.     Thus, PaySchools actively misrepresents and conceals material information about the purpose of the Junk Fees it charges to consumers.

---

[23] *Is There a Cost or Fee for Using PaySchools Central or PaySchools Mobile*, https://payschoolscentral.com (click on "hamburger menu" in upper-right corner, select "Help," select "Is There a Cost or Fee for Using PaySchools Central or PaySchools Mobile?" (last accessed April 25, 2025).

    **c.    PaySchools Breaches its Contractual Obligation to Disclose Fees Prior to Completing Payment and Entering the Contract**

89.    School districts direct parents to the PaySchools website to create an account, and as part of the account setup process, parents are forced to agree to the PaySchools TOS.

90.    The PaySchools TOS states that "[i]f you are required to pay a fee, we will disclose the fee to you before you complete your payment. If you do not wish to pay the fee, you will not be obligated to proceed with the transaction." Ex. B, Sec. 17(e)(ii). However, families, in reality are left with essentially no other choice, but to pay the fees, if they want to provide a meal for their children at school.

91.    Parents and guardians whose schools' contract with PaySchools are strongly encouraged to enable PaySchools' "Auto-Replenish" feature on their child's payment account.

92.    A parent or guardian sets up the "Auto-Replenish" feature by identifying a payment source (a credit card, debit card, or bank account); a minimum balance (for example, $5.00); and an automatic payment amount (for example, $10.00). PaySchools will then automatically deduct the specified payment amount from the payment source whenever the child's account balance drops below the minimum balance.

93.    PaySchools charges the same Junk Fees to payments made using its Auto-Replenish feature as it does for payments made through the standard payment workflow.

94.    Contrary to its contractual obligations, PaySchools extracts the Auto-Replenish amount, plus the Junk Fees, *prior* to disclosing that fees will apply to the transaction.

**D.    Plaintiff's Experience with PaySchools**

95.    Plaintiff is the parent of a student in the Garden City Union Free School District ("GCUFSD") in Garden City, New York.

15

96.     Defendants contracted with GCUFSD to provide payment processing services through the website Defendants maintains at www.payschoolscentral.com ("PaySchools Central").

97.     Plaintiff created and uses an online account on PaySchools Central.

98.     Plaintiff contracted with PaySchools in which she made payments and they made arrangements by which her child would reach school lunches.

99.     Plaintiff uses PaySchools Central to transfer funds to her child's school lunch account. Plaintiff usually loads money onto her child's account on a bi-weekly basis, *i.e.* once every two weeks, and transfers less than $50.00 to her child's account in each transaction.

100.     For transactions of under $50.00, Defendants charge Plaintiff a flat transaction fee of $1.75. Upon information and belief, if Plaintiff were to add more than $50.00 to her child's account in a single transaction, Defendants would add a transaction fee of 4.75% of the funds transfer.

101.     In other words, *at the very minimum*, Defendants add a 3.5% fee ($1.75 on a $50 transaction), purportedly for processing Plaintiff's payments and covering the costs of maintaining the PaySchools Central site. But Defendants' fee is often more egregious; for example, Defendants' fee represents a massive 17.5% for a $10.00 transfer ($1.75 on a $10 transaction), which equates to over 11 times that actual cost of the transaction[24].

102.     Plaintiff has also used PaySchools' Auto-Replenish feature and specified a payment amount of $10.00 when her child's account balance drops below the minimum.

---

[24] *See* Visa Product and Service Rules at Rule 5.5.1.8 (permitting a surcharge maximum amount of 3%); *id.* at Table 5-4 (requiring "a flat or fixed amount, regardless of the value of the payment due.").

103.    PaySchools did not warn or disclose to Plaintiff that her Auto-Replenish payment would incur $1.75 in Junk Fees.

104.    Plaintiff only learned about the addition of Junk Fees to her Auto-Replenish payment when she received an email receipt charging her $11.75 to add $10.00 to her child's school lunch account.

105.    Plaintiff would not have used PaySchools for payment processing had she known that the Junk Fees PaySchools charges were unrelated to the actual costs PaySchools incurs for payment processing and website maintenance.

106.    Plaintiff would not have used PaySchools for payment processing had she known that she would incur undisclosed Junk Fees when using the Auto-Replenish feature.

107.    PaySchools also failed to disclose or make available a fee-less processing option.

## CLASS ACTION ALLEGATIONS

108.    Plaintiff brings this case individually and, pursuant to Rule 23, on behalf of the class defined as:

> All citizens of New York who, in the six years preceding the filing of the Complaint, paid Junk Fees to PaySchools.

109.    Subclasses may be necessary based on the nature of the Junk Fees assessed.

110.    Specifically excluded from the Class are Defendants; any entity in which Defendants has a controlling interest; Defendants' legal representatives, officers, directors, agents, trustees, assigns, successors, or other persons or entities related to or affiliated with Defendants and/or Defendants' officers; the judge to whom this case is assigned; his or her court staff and law clerks; all members of the judge's immediate family; and Class Counsel.

111.    Subject to additional information obtained through further investigation and discovery, Plaintiff reserves the right to amend, narrow, or expand the class definition.

112.   **Numerosity:** The Class is so numerous that joinder of all members is impracticable. Plaintiff does not know the exact size of the Class because this information is exclusively within Defendants' control. However, based on the nature of the commerce involved, and the size and scope of Defendants' business, Plaintiff believse the Class likely numbers in the tens or hundreds of thousands. The names and addresses of all such Class members are known to Defendants and can be identified through Defendants' records. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

113.   **Commonality:** There are questions of law and fact common to the members of the Class including, without limitation:

a) Whether Defendants' descriptions of its Junk Fees are unfair and deceptive;

b) Whether Defendants' Junk Fees pay for processing costs or are mostly profit;

c) Whether Defendants violated New York law by concealing that its fees were not reasonably related to costs incurred;

d) Whether Defendants' violations of New York law proximately caused ascertainable losses to Plaintiff and Class members;

e) The amount of damages and other relief to be awarded to Plaintiff and the Class members; and

f) Whether Plaintiff and Class members are entitled to injunctive relief.

114.   **Typicality:** Plaintiff's claims are typical of the claims of the members of the Class. Plaintiff and the other Class members were all subject to a standard form Terms of Use agreement and were charged the same unlawful Junk Fees by Defendants. Plaintiff and Class members seek identical legal remedies under identical legal theories. Plaintiff's claims do not conflict with the interests of any other members of the Class.

115.    **Adequacy of Representation:** Plaintiff is an adequate class representative because his interests do not conflict with the interests of the other Class members whom she seeks to represent. Plaintiff has retained competent counsel who are experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. Class members' interests will be fairly and adequately protected by Plaintiff and her counsel.

116.    **Predominance.** Common questions of law and fact predominate over any questions affecting only individual Class members. Identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendants' liability and the fact of damages is common to Plaintiff and each member of the Class. If Defendants breached its contracts to Plaintiff and Class members, then Plaintiff and each Class member suffered damages by that conduct.

117.    **Superiority:** A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages or other financial detriment suffered by Plaintiff and the other Class members is relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendants, making it impracticable for Class members to individually seek redress for Defendants' wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individual litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

118.    Defendants also acted and refused to act on grounds generally applicable to the Class, thereby making appropriate declaratory and injunctive relief for the Class as a whole. Separate actions would create the risk of inconsistent or varying adjudications with respect to individual Class members.

**FIRST CLAIM FOR RELIEF**
**VIOLATION OF N.Y. GBL § 349**
**(On Behalf of Plaintiff and the Class)**

119.    Plaintiff repeats and re-alleges the factual allegations above, as if fully alleged herein.

120.    New York Law prohibits "[d]eceptive acts or practices in the conduct of any business, trade, or commerce or in the furnishing of any service" in the state of New York. N.Y. GBL § 349(a).

121.    PaySchools' payment platform is a business, trade, commerce, and/or service offered within the state of New York, within the meaning of N.Y. GBL § 349(a).

122.    PaySchools' collection of transaction, convenience, and junk fees for monetary transfers made on its payment platform is conduct oriented toward consumers like Plaintiff and Class members.

123.    PaySchools engaged in a deceptive business practices by making misleading or false statements regarding fees charged to Plaintiff and the putative Class members.

124.    PaySchools violated New York law when it misrepresented the purpose of the fees it charges to use its platform. PaySchools represents that its fees cover the "cost" of processing payment transactions and running its website. That statement is a false and deceptive misrepresentation because the cost of processing payment transactions is well below the amount

of the fee charged. Thus, the Junk Fees it charges for electronic transactions is mostly profit, which PaySchools keeps.

125.    PaySchools also violates New York law when it fails to disclose and conceals from Plaintiff and Class members material facts including that (1) the amount of the fees it charges bear no reasonable relationship to the costs it incurs to provide electronic payment processing services and maintain its website, and are far in excess of the cost, if any, incurred by actual services performed in processing deposits into Plaintiff's and the Class members' accounts; (2) that the fees it charges parents are primarily for profit; and (3) that it also assesses duplicative charges to the school districts for its services.

126.    PaySchools failed to disclose material terms that would be important to consumers, such as the existence of fee-free payment options, the payments made by the school (or school district) to cover the cost of Defendants' services, the actual cost of Defendants' services, the fact that less food and beverages are accessible to children because of these fees, the existence of the terms of the contract between the school (or school districts) and PaySchools, and the fact that federal law prevents the assessment of any fees – let alone junk fees.

127.    Upon information and belief, PaySchools' contract with the school and/or the school district requires it to abide by not just state and federal law, but also comply with rules dictated by financial institutions and credit card companies – especially those related to being a merchant and assessing fees on business transactions.

128.    Upon information and belief, the rules of credit card companies, like Visa's Rules have been incorporated into the contracts and terms of service between Defendants and the school where Plaintiff Hess made payments.

129.    PaySchools has violated Visa's Rules[25] in several material ways:

a.    Under Table 5-4 at line 3 (page 371 of Visa's Rule), PaySchools cannot charge a convenience fee if "the Merchant operates exclusively as a Card-Absent Environment." Upon information and belief, the school cafeteria at Plaintiff's school was a card-absent environment because the school did not accept credit cards at the point of sale.

b.    Under Table 5-4 at line 4, PaySchools can only charge a convenience fee if that merchant provides goods or services to the Cardholder.

c.    Under Table 5-4 at line 7, PaySchools may only charge "a flat or fixed amount regardless of the value of the payment due," but PaySchools charges a 4.75% fee on transactions above $50.

d.    Under Table 5-4 at last line, a convenience fee cannot be charged on a "Recurring transaction or an Installment Transaction." Plaintiff Hess was assessed a convenience fee on her recurring transactions.

e.    Under 5.5.1.8, PaySchools may only charge a surcharge that is limited to 3.00%, but PaySchools charges 4.75% as a convenience fee on payments above $50. PaySchools regularly charges more than 3% on its Junk Fees, well above the maximum amount.

130.    Table 5-4 provides the following directives:

---

[25] See https://usa.visa.com/dam/VCOM/download/about-visa/visa-rules-public.pdf

**Table 5-4: Convenience Fee Requirements**

| Convenience Fee Requirement | AP Region | US Region |
|---|---|---|
| Charged for a bona fide convenience in the form of an alternative payment channel outside the Merchant's customary payment channels and not charged solely for the acceptance of a Card | X | X |
| Added only to a Transaction completed in a Card-Absent Environment | X | X |
| Not charged if the Merchant operates exclusively in a Card-Absent Environment | X | X |
| Charged only by the Merchant that provides goods or services to the Cardholder | X | X |
| Applicable to all forms of payment accepted in the payment channel | X | X |
| Disclosed clearly to the Cardholder:<br>• As a charge for the alternative payment channel convenience<br>• Before the completion of the Transaction. The Cardholder must be given the opportunity to cancel. | X | X |
| A flat or fixed amount, regardless of the value of the payment due<br>In the AP Region: An ad valorem amount is allowed if required by applicable laws or regulations. | X | X |
| Included as part of the total amount of the Transaction and not collected separately | X | X |
| Not charged in addition to a surcharge | X | X |
| Not charged on a Recurring Transaction or an Installment Transaction | X | X |

ID# 0027492 | Edition: Apr 2025 | Last Updated: Apr 2023

131.    Plaintiff Hess made payments via her Visa card.

132.    PaySchools assessed convenience fees that violated Table 5-4 above.

133.    PaySchools has violated Visa's Rules, and upon information and belief other credit card rules of a similar nature, as a merchant, which were incorporated into the agreement with the school and school district.

134.    For example, PaySchools markets and assesses these improper Junk Fees such as the following:



135.    Additionally, PaySchools violates Visa Table 5-4 by charging **any** convenience fee because the "Merchant operates exclusively in a Card-Absent Environment."

136.    Because children do not traditionally hold credit cards and because schools in cafeterias do not accept credit cards, the Merchant (i.e., the school cafeteria) is a "Card-Absent Environment.").

137.    PaySchools violated GBL § 349 by overcharging students and their families significantly more than the cost of providing the services and grossly inflating the Junk Fees charged onto bills and payments by families and students.

138.    PaySchools further violated the law by forcing students and their families into circumstances whereby those students and families, as consumers, had no alternative means of paying for school lunches without incurring significantly inflated costs.

139.    PaySchools further violated the law by deceptively charging a fee (which it knew or should have known to be illegal under federal law), by mislabeling, and then displaying it as a convenience or processing fee.

140.    Upon information and belief, PaySchools further violated the law by preventing other competitors from entering the market for the same services at the school (or within the school district) that might provide cheaper services.

141.    PaySchools further violated the law by not complying with credit card company rules like Visa's Rules that provide limitations on how, when, the amount, and the nature of the Junk Fee being assessed.

142.    PaySchools' omissions and intentional misstatements were knowing and willful because PaySchools knows its own costs, profits, and terms of its contracts with school districts, and affirmatively conceals the same from consumers like Plaintiff and Class members.

143.    PaySchools' omissions were material because reasonable consumers would not choose to pay fees knowing that they are well in excess of cost or that fee-free methods of payment are available, contrary to PaySchools' representations. PaySchools intended that Plaintiff and the Class rely on its material omissions.

144.    The scheme perpetrated by PaySchools in the way it assessed its Junk Fees was deceptive and unfair, and its explanation for the Junk Fees it charged was false and/or misleading. PaySchools' conduct lacks honesty in fact, fair dealing, and good faith and has the capacity to, and did, mislead consumers like Plaintiff and the Class who were acting reasonably.

25

145.    PaySchools scheme is designed to generate fees for itself, and its shareholders, without regard to the negative impact its fees have on students' access to food, nutrition, lunch, breakfast, and milk, and the consequential effect its fees have on students' ability to learn.

146.    PaySchools' scheme is designed to double-dip: take money from the parents, and take money from the schools (or school districts) – while closing the door on any competition within the school (or school district).

147.    The result of PaySchools' excessive profit-taking is that both parents and schools are left with less money to pay for food for students.

148.    PaySchools' Junk Fees are also unlawful because they violate federal policy as articulated by the USDA.

149.    USDA is responsible for administering the National School Lunch Program under the Richard B. Russell National School Lunch Act, 42 U.S.C. § 1751 et seq. ("National School Lunch Act"). USDA regularly issues policy memoranda, regulations, and other guidance materials relating to National School Lunch Act requirements.

150.    In 2010, USDA issued guidance stating that "[c]hildren participating in School Nutrition Programs shall not be charged any additional fees for supervision or other services provided in conjunction with the delivery of benefits under these programs. . . . By charging fees in addition to the regular reduced price or paid meal charge, a school is limiting access to the program and imposing an additional criterion for participation," in violation of the National School Lunch Act.[26]

---

[26] *See* U.S. Department of Agriculture, Food and Nutrition Services, *Online Fees in the School Meal Programs*, https://fns-prod.azureedge.us/sites/default/files/cn/SP02-2015os.pdf (Oct. 8, 2014).

151.    USDA updated that guidance in 2014 to state that School Food Authorities, i.e., school districts, could "charge a fee for these types of services" so long as the School Food Authorities offer a method to add money to the account that does not incur fees.[27]

152.    Under USDA regulations, a "School Food Authority" is "the governing body which is responsible for the administration of one or more schools." 7 C.F.R. § 210.2.

153.    PaySchools is not a "School Food Authority." While the 2014 Guidance allows a School Food Authority to charge a fee, nothing in the 2014 Guidance extends that permission to third party service providers like PaySchools.

154.    PaySchools' Junk Fees are not charged by a School Food Authority, nor are they passed on to or retained by a School Food Authority. Instead, PaySchools keeps Junk Fees for profit. This practice violates USDA policy stating that children participating in school nutrition programs "shall not be charged" additional fees, because such fees limit access to the program and impose additional criteria for participation.

155.    PaySchools' fee practices described above contravene N.Y. GBL § 349.

156.    Plaintiff and the Class members were damaged and suffered ascertainable losses when they paid fees to PaySchools without full knowledge of the relevant facts. Had PaySchools not misled Plaintiffs and the Class as to the true nature of its fees, and concealed material information from them, Plaintiff and the Class would not have paid PaySchools' fees.

157.    As a result of PaySchools' above-mentioned violations, Plaintiff suffered an ascertainable loss of an amount no less than the amount of their payments of fees to PaySchools.

158.    But for PaySchools' deceptive acts, misrepresentations, and omissions in violation of New York law, Plaintiff and Class members would not have suffered any monetary damage.

---

[27] *Id.*

159.    PaySchools' acts and practices in violation of N.Y. GBL § 349 were willful and knowing.

160.    Plaintiff and each Class members are entitled to a refund of their actual damages, *i.e.* all of the money they paid to PaySchools in the form of unlawful Junk Fees, or fifty dollars, whichever is greater; treble damages for PaySchools' willful and knowing violations, and reasonable attorneys' fees and costs. N.Y. GBL § 349.

<u>SECOND CLAIM FOR RELIEF</u>
**BREACH OF CONTRACT**
**(On Behalf of Plaintiff and the Class)**

161.    Plaintiff repeats and re-alleges the factual allegations above, as if fully alleged herein.

162.    Plaintiff and Class members contracted with PaySchools for use of its electronic payment platform.

163.    Plaintiff and Class members gave consideration and performed all conditions precedent to filing this action.

164.    PaySchools promised Plaintiff and Class members that (1) that it would provide students with money that would result in school lunches and food, and (2) it would disclose the existence of any transaction fees prior to completing any payment to PaySchools.

165.    PaySchools did not provide the full amount of services contracted for because it skimmed from the top in the form of exaggerated Junk Fees.

166.    PaySchools did not provide the services contracted for because the Junk Fees were inflated beyond the actual cost of providing the transaction such that PaySchools reaped extraordinary charges and benefits.

167.    PaySchools did not disclose to Plaintiff and Class members that a payment made using the PaySchools' "Auto-Replenish" feature would be subject to additional transaction junk fees.

168.    Despite failing to disclose the existence of transaction fees for *any* payment using the "Auto-Replenish" feature, PaySchools materially breached the contract by charging Plaintiff and Class members Junk Fees for *every* payment completed through that feature.

169.    PaySchools breached the contract and have harmed Plaintiff, students, and their families.

170.    As a direct and proximate result of PaySchools' material breach, Plaintiff and Class members were harmed. Plaintiff and Class members suffered actual damages as a result of PaySchools' breach. Plaintiff and the putative Class are entitled to a refund of the amount paid as transaction fees for use of the Auto-Replenish feature.

171.    Plaintiff and Class members seek all damages available under law.

**THIRD CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(On Behalf of Plaintiff and the Class)**

172.    Plaintiff repeats and re-alleges the factual allegations above, as if fully alleged herein.

173.    Plaintiff brings this claim individually and on behalf of the members of the Class in the alternative to the Second Claim for Relief.

174.    Defendants received benefits from Plaintiff and the Class in the form of fees paid to Defendants.

175.    PaySchools collected Junk Fees were inflated beyond the actual cost of providing the transaction such that PaySchools reaped extraordinary charges and benefits.

176.    PaySchools has been unjustly enriched by forcing Plaintiff, students, and families to engage in the arrangement by which PaySchools takes a transaction or Junk Fee from each and every transaction.

177.    PaySchools has been unjustly enriched by preventing customers like Plaintiff from being able to negotiate in the open marketplace such that other providers could offer similar competitive services within the same school, and customers could negotiate the price of such services.

178.    PaySchools has been unjustly enriched by failing to offer similarly convenient and cost-effective alternatives to students, customers and families, including making ordinary and normal disclosures that might have given Plaintiff, students, and families reasonable and less costly alternatives to fund school lunches.

179.    PaySchools has been unjustly enriched by failing to disclose the availability of those cheaper alternatives that would have resulted in more food for students.

180.    It would be unjust to allow Defendants to retain the benefits received from Plaintiff and the Class because Defendants misrepresented the nature and purpose of the fees it charged and received.

181.    Defendants are not entitled to keep any fees over and above the actual cost of the services, including an offset accounting for the school's contractual payments to PaySchools.

182.    It would be unjust to allow Defendants to profit from transaction fees imposed on school lunch, breakfast, and milk programs, when Defendants are already compensated for their services directly through guaranteed contractual payments obtained from school districts.

183.    At most, Defendants are entitled to receive only the portion of any fee that was actually used to cover processing costs and the cost of maintaining its website—an amount far less

30

than the amount Plaintiff and the Class paid. Any excess must be returned to Plaintiff and Class members.

184.    Plaintiff and Class members seek restitution of benefits unjustly retained by Defendants.

**FOURTH CLAIM FOR RELIEF**
**FRAUD BY MATERIAL OMISSION**
**(On Behalf of Plaintiff and the Class)**

185.    Plaintiff repeats and re-alleges the factual allegations above, as if fully alleged herein.

186.    Plaintiff brings this claim of Fraud on behalf of herself and a class of similarly situated individuals.

187.    PaySchools in its interactions with Plaintiff failed to disclose any other methods for conducting transactions that were free from the Junk Fees, except for cash payments.

188.    PaySchools utilized public materials and generalized templated documents to convey its offerings and the nature of its services, which similarly did not disclose the fee-free options.

189.    These disseminations and conveyances contained material misstatements by omission, upon which Plaintiff and similarly situated families and parents relied – namely because they were not given the chance to decide for themselves whether it was relevant or material to their decision to send money to Defendants for school lunches for their child.

190.    Upon information and belief, Defendants were aware that Plaintiff, students, and their families would not pay excessive Junk Fees with the disclosure of fee-less options.

191.    Defendants' failure to disclose the Junk-Fee-less options resulted in greater harm to Plaintiff, who would have chosen or made other arrangements to fund her child's lunch account.

31

192.    Upon information and belief, similarly situated class members were affected by this lack of disclosure and the harm done.

193.    Plaintiff and Class members seek damages, attorney's fees, and costs.

**FIFTH CLAIM FOR RELIEF**
**BREACH OF CONTRACT – THIRD PARTY BENEFICIARY CLAIM**
**(On Behalf of Plaintiff and the Class)**

194.    Plaintiff repeats and re-alleges the factual allegations above, as if fully alleged herein.

195.    Plaintiff brings a third-party beneficiary claim that PaySchools has violated its contract with the schools and school districts.

196.    As a parent of a student within the school and school district, Plaintiff Hess is not privy to the exact terms of the contract and its terms, but has requested the same via a freedom of information act request that remains pending.

197.    Upon information and belief, school districts across the country regularly require merchants to comply with the rules and regulations of Visa, Mastercard, Discover, and American Express. *See Story v. Heratland Payment Systems, LLC*, Case No. 3:19-cv-724-TJC-JBT (M.D. Fla. March 8, 2021)(Dkt. 117 at ¶ 26 [referring to a "standard-form contract titled 'Government and Public Education Credit/Debit Card Processing Agreement" as an agreement "used by … other schools across the country."]).

198.    Upon information and belief, PaySchools is a merchant under the terms of its contract with the schools, the school district, and with credit card companies like Visa.

199.    Upon information and belief, PaySchools is under an obligation through these various contracts to comply with rules of the credit card companies, like Visa's Rules.

200.    PaySchools has violated Visa's Rules by: (1) assessing a convenience or junk fee on recurring charges like those of Plaintiff Hess, (2) by assessing a convenience fee in a "card-absent environment" that is the school cafeteria, (3) by assessing charges above 3%, (4) by assessing a 4.75% charge on transactions above $50, (4) by assessing a charge in a circumstance where PaySchools is not the one providing any actual food or beverage service to the cardholder.

201.    Thus, PaySchools violated its contract with the school and school district by not complying with the rules of the credit card companies – via Plaintiff Hess' Visa credit/debit card payments.

202.    Plaintiff Hess and her child were the intended beneficiary of the contract between PaySchools and the school (and/or school district).

203.    Defendants have violated New York common law in the form of breaching its contractual duty wherein Plaintiff and her fellow parents, guardians, and students were the intended third-party beneficiaries.

204.    Defendants' breach has harmed Plaintiff Hess and her fellow parents, guardians, and/or children in the form of amounts paid over and above the legally allowed fees and charges.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on behalf of herself and all others similarly situated, prays that the court enter an order:

(a)    Certifying the Class under C.P.L.R. §§ 901 & 902, naming Plaintiff as representative of the Class and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(b)    Declaring PaySchools responsible for notifying all Class members of this action;

(c)    Imposing injunctive relief, including prohibiting PaySchools from charging on a per transaction basis;

33

(d)     Declaring that PaySchools is in breach of its contracts with Plaintiff and Class members and awarding compensatory damages;

(e)     Awarding disgorgement of all Junk Fees collected and retained from Plaintiff and Class members; awarding actual damages, punitive damages; and statutory and treble damages pursuant to N.Y. GBL § 349.

(f)     Awarding Plaintiff reasonable attorneys' fees, costs, and expenses;

(g)     Awarding pre- and post-judgment interest on any amounts awarded; and,

(h)     Awarding such other and further relief as may be just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff demands a trial by jury of any and all issues in this action so triable of right.

Dated: October 10, 2025

Respectfully submitted,

___/s/ Michael A. Tompkins_____
Michael A. Tompkins, Esq.
Anthony M. Alesandro, Esq.
**LEEDS BROWN LAW, P.C.**
One Old Country Road, Suite 347
Carle Place, NY 11514
(516) 873-9550
mtompkins@leedsbrownlaw.com
aalesandro@leedsbrownlaw.com

Nicholas A. Colella, Esq.*
**LYNCH CARPENTER LLP**
1133 Penn Avenue, 5th Floor
Pittsburgh PA 15222
412.322.9243
nickc@lcllp.com
*Admitted Pro Hac Vice*

*Counsel for Plaintiff and Proposed Class*